

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 13, 2023

**BY ECF**
Hon. Colleen McMahon
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re:    *United States v. Derrick Latimore*, 22 Cr. 82 (CM)

Dear Judge McMahon:

    Defendant Derrick Latimore, a/k/a "Cone," the defendant, is scheduled to be sentenced by this Court on September 19, 2023, after sustaining his ninth conviction for a narcotics offense, having participated in a narcotics conspiracy that injected kilograms of cocaine into Harlem from 2020 up to February 2022. As explained below, the Government submits that a sentence within the Stipulated Guidelines Range of 121 to 151 months imprisonment followed by three years of supervised release would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing, especially in light of the defendant's attempts to intimidate a witness in this case. The Probation Department has recommended a Guidelines sentence of 135-months imprisonment. (PSR p. 30) Defense counsel has requested a significantly below guidelines-sentence of 36 months imprisonment.

    I.    **Background**

    a.  **The Downtown Mafia**

    On February 8, 2022, a grand jury in the Southern District of New York charged Quincy Hilliard, a/k/a "Tut," Curtis Hilliard, a/k/a "Curt," Gary Brown, a/k/a "Gleme," Terrence Turner, a/k/a "Storm," Kasien Adderley, a/k/a "Kaz," Tiran Branch, Pedro Rivera, a/k/a "Dro," Derrick Latimore, a/k/a "Cone," and Antwan Andrews, a/k/a "Twan" — with one count of conspiracy to commit cocaine and crack trafficking in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). The charges stemmed from their membership in a drug trafficking organization ("DTO") called the "Downtown Mafia" ("DTM"), which was a group of kilogram quantity cocaine traffickers and subordinates operating primarily in the vicinity of King Towers in Harlem, New York. While DTM's sales were largely concentrated in and around King Towers, members of the conspiracy also operated multiple stash houses in Manhattan and at least one stash house in New Jersey.

    Q. Hilliard, C. Hilliard, Brown, and Adderley were kilogram-quantity cocaine traffickers who supplied cocaine to each other in furtherance of the DTM's operations. Turner was a dealer who worked principally with Brown. Branch was a dealer who worked principally with Adderley

and Q. Hilliard. Rivera, Latimore, and Andrews were dealers who worked principally with the Hilliard brothers. The co-conspirators coordinated their narcotics activities through in-person meetings, phone communications, and Instagram chats.

Between February 2021 and February 2022, members of DTM sold approximately 1.22 kilograms of cocaine and approximately 47.598 grams of crack cocaine to a confidential source and undercover law enforcement officers engaged in the investigation of the DTM. Through other investigative techniques, including surveillance, witness information, social media communications, and phone contents, law enforcement identified an additional 47 kilograms of cocaine and 80 grams of crack cocaine involved in the conspiracy. For example, a cell phone belonging to defendant Q. Hilliard contained a video of 1232.2 grams of cocaine that was being weighed on a scale, as well as extensive narcotics-related communications with co-conspirators Latimore and Branch. As another example, the Instagram account belonging to Q. Hilliard contained conversations with co-conspirators Latimore, Brown, Andrews, Rivera and Branch in which the DTM members discussed, among other things, setting up meetings and narcotics and cash using coded language.

b.  **Relative Culpability**

In terms of narcotics conduct, Latimore is among the least culpable defendants. However, as discussed further herein, Latimore's post-indictment conduct differentiates him from his co-defendants.

The table below reflects the Guidelines range for those defendants who have so far pleaded guilty in this case:

| Defendant | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|
| Quincy Hilliard | 31 | IV | 151 to 188 mo. | 60 mo. | |
| Curtis Hilliard | 27 | I | 70 to 87 mo. | 60 mo. | 70 mo. |
| Kasien Adderley | 34 | VI | 121 to 151 mo. | 60 mo. | |
| | 32* | VI | 188 to 235 mo.* | 60 mo. | |
| Antwan Andrews | 27 | I | 70 to 87 mo. | None | |
| Terrence Turner | 27 | IV | 100 to 125 mo. | None | 48 mo. |
| Tiran Branch | 25 | II | 63 to 78 mo. | None | |
| Derrick Latimore | 30 | III | 121 to 151 mo. | None | |
| Pedro Rivera | 27 | IV | 100 to 125 mo. | None | |

*Career Offender Guidelines

Hon. Colleen McMahon
September 13, 2023

### c. Conduct Specific to Derrick Latimore, a/k/a "Cone"

The defendant was a cocaine, crack cocaine, and marijuana dealer who worked primarily with the Hilliard brothers—in particular, with Quincy Hilliard. His role in the scheme has been corroborated by social media activity and witness testimony. As a member of the scheme, Latimore was responsible for selling generally gram quantities of crack cocaine and cocaine. Latimore worked directly for, and with, senior members of the DTO, including Q. Hilliard. Demonstrating his ability to access the highest levels of the DTO, over the course of the scheme, Latimore communicated directly with Q. Hilliard. For example, on one occasion, Latimore sent a message to Q. Hilliard about, in sum and substance, a Brooklyn-based customer who he was attempting to connect with a supplier. Latimore explained to Q. Hilliard, in sum and substance, that he (Latimore) had attempted to connect the customer with his co-defendant Antwan Andrews, a/k/a "Twan," but Andrews had been unable to assist so Latimore requested that Q. Hilliard contact the customer directly. As reflected above, in terms of relative culpability in the charged conspiracy, Latimore is in the bottom third of the charged defendants.

What differentiates Latimore from his co-defendants is his conduct post-indictment. During his period of pretrial supervised release, Latimore displayed a consistent pattern of non-compliance and a complete lack of remorse. For example, in violation of federal narcotics law and while facing federal narcotics charges, Latimore boldly engaged in the bulk sale of marijuana and advertised so doing via Instagram and via text message. On one occasion, Latimore, in sum and substance, offered a customer marijuana at the price of $4,000 per unit. As depicted below, on two other occasions, he advertised bulk quantities of marijuana on his public Instagram story. Despite this communication and the volume of marijuana in the posts published on his own account, when confronted, the defendant claimed — implausibly — that he neither sold nor possessed the marijuana in these depictions.




3

Hon. Colleen McMahon
September 13, 2023

Even more troubling, during his period of supervised release, Latimore engaged in attempts to intimidate a witness via Instagram. On April 14, 2023, Latimore posted a photograph of ▉▉▉▉▉▉▉▉▉▉▉ with a giant rat emoji in a clear attempt to publicly label ▉▉▉▉▉▉ as a cooperating witness and intimidate ▉▉. A week later, on April 25, 2023, at approximately 11:30 a.m. — hours before appearing before the Honorable Colleen McMahon for a bail revocation hearing during which he denied knowing the colloquial meaning of the term "rat" — Latimore posted an Instagram story in which he stated, "RAT N***** REPORTED MY PAGE , NOW THEY KEEPING ME BE BACK NEXT YEAR #FREE THE REAL."




### d. Plea and Guidelines Calculation

On May 18, 2023, the defendant pleaded guilty, pursuant to a plea agreement, to a violation of Title 21, United States Code, Section 841(b)(1)(C). In the plea agreement, the parties agreed that the defendant was to be held accountable for the distribution of between 3.5 and 5 kilograms of cocaine. In addition, the parties agreed that a two-point enhancement should be applied for the defendant's attempts to obstruct justice through witness intimidation as described above. Because the defendant obstructed justice, he is not entitled to a reduction for acceptance of responsibility. Accordingly, the parties agreed that the total offense level is 30. The parties also stipulated that the defendant was in criminal history category III with six criminal history points, yielding a Stipulated Guidelines Range of 121 to 151 months.

Hon. Colleen McMahon
September 13, 2023

The Probation Department calculated that same offense level (30) as the parties but reached a different conclusion as to the criminal history category. Specifically, the Probation Department identified an additional conviction resulting in one additional criminal history point and a criminal history category of IV. Accordingly, the Probation Department calculated a Recommended Guidelines Range of 135 to 168 months. The Probation Department recommends a 135-month term of imprisonment.

### II.   Discussion

#### A.   Applicable Law

As the Court is well aware, although the United States Sentencing Guidelines are no longer mandatory, they provide strong guidance to courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  The Guidelines' relevance stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). After making that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to deter criminal conduct and promote respect for the law, the need to protect the public from further crimes of the defendant, and the need to avoid unwarranted sentencing disparities. *Gall v. United States*, 552 U.S. 38, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### B.  A Sentence Within the Stipulated Guidelines Range Is Appropriate In This Case

The Government respectfully submits that an incarceratory sentence within the Stipulated Guidelines Range of 121 to 151 months is sufficient and necessary to reflect the seriousness of the conduct, to provide just punishment, and to promote general and specific deterrence.

The conduct at issue in this case is extremely serious. The defendant participated in a large-scale cocaine distribution scheme that flooded the streets of Harlem with highly addictive substances — cocaine and crack cocaine — both of which lead to devastating illness, destabilize communities, and fund vicious criminal organizations. Over the course of the scheme, the

5

Hon. Colleen McMahon
September 13, 2023

defendant worked primarily for and with his co-defendant and leader of the scheme, Quincy Hilliard. Although Latimore's participation in the conspiracy was less robust than that of some of his co-defendants, it is no less serious, especially given the defendant's criminal history which is rife with narcotics activity.

The defendant is an experienced drug dealer who, as reflected by his criminal record, has repeatedly engaged in the sale of narcotics despite repeated periods of incarceration. Like his co-defendant Terrence Turner, the defendant is not a young man who made a rash decision out of desperation, ignorant of the possible consequences. Quite the opposite. He is a 43-year-old man with ten previous convictions, some of which resulted in multi-year prison terms. In this case, even a pending federal narcotics prosecution could not deter the defendant from continuing to try to profit from the sale of drugs. A below-Guidelines sentence—particularly a substantially below-Guidelines sentence of 36 months as proposed by the defense— would undermine the purposes of sentencing and understate the defendant's likelihood to recidivate. A substantial term of imprisonment is necessary to protect the community from the defendant's future crimes.

Put simply, time and time again, in exchange for nothing more than financial gain, the defendant injected into his community a substance that destroys lives. And he did so at a time when deaths from drug poisoning are on the rise. Between 2010 and 2018, overdose deaths involving cocaine increased by approximately 251%.[1] In 2018, New York led the nation with 1,276 deaths resulting from overdoses involving cocaine.[2] In 2019, nearly 16,000 Americans died as a result of drug overdoses involving cocaine and currently, cocaine is involved in almost one in five overdose deaths.[3] Even short of death, the consequences of cocaine addiction can be crippling for a user: paranoia, psychosis, stroke, seizures, respiratory failure, and organ damage.[4]

Cocaine harms not just its users, but also their family and friends and the broader communities to which they belong. For this reason, major drug crimes are among "the most serious" offenses proscribed by federal law. *United States v. Dillard*, 214 F.3d 88, 101 (2d Cir. 2000); *see also United States v. Colon*, No. 10 Cr. 197 (CM), 2020 WL 4496761, at *2 (S.D.N.Y. Aug. 4, 2020) (describing cocaine as "a highly addictive drug that destroys lives, families, and communities"); *United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (describing study in preeminent medical journal in which cocaine was found to have "second-highest mean harm score of all twenty drugs [under study], after heroin").

---

[1] *See* Drug Enforcement Administration, National Drug Threat Assessment (March 2021), *available at* https://www.dea.gov/sites/default/files/2021-02/DIR-008-1%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

[2] *Id.*

[3] *See* Centers for Disease Control and Prevention, Drug Overdose, *available at* https://www.cdc.gov/drugoverdose/deaths/other-drugs.html.

[4] *See* National Institute on Drug Abuse, What Are the Long-Term Effects of Cocaine Use? (May 2016), *available at* https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use.

Hon. Colleen McMahon
September 13, 2023

These devastating statistics make obvious the need for a serious sentence to promote general deterrence and respect for the law. Drug crimes are lucrative, and the number of individuals willing to engage in such crimes for even modest profit is, unfortunately, too high. An incarceratory sentence within the Stipulated Guidelines Range will send the message that the narcotics business is unacceptable and that purveyors of narcotics, especially repeat players like the defendant, will be punished appropriately.

As it relates to this defendant, a substantial sentence is also necessary to address the seriousness of his post-indictment conduct. Aside from his participation in a narcotics enterprise, the defendant engaged in grave conduct when he attempted to intimidate a witness in this case. Social media is ubiquitous in American society. The defendant's Instagram account boasts 12,000 followers — many of whom reside in his community. The defendant's post was the modern-day equivalent of nailing a rat to the witness's front door to send a simple message — "You cooperated. You are not safe." Each pair of eyes that landed on the defendant's Instagram page saw and internalized the same message. There is no question what the defendant was attempting to communicate and its desired effect. And when he got caught, the defendant showed no remorse. Instead, he brazenly doubled down, speculating that ███ was responsible for his bail revocation and publicly blaming ███ for his (Latimore's) incarceration. He showed no remorse. He showed no acceptance of responsibility. He showed no signs that he appreciated the "gravity" of his actions — as he now claims. (Def. Sub. at 4.) A clear message must be sent to this defendant and others like him— witness intimidation will never be tolerated.

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the parties' stipulated guidelines range.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: *Ashley C. Nicolas*
Ashley C. Nicolas/Alexander Li/Matthew J. King
Assistant United States Attorneys
(212) 637-2467

7